UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:25CR24 MTS(SPM) |
| | ) | |
| NICHOLAS MAYS | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND**
**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). Now before the Court is Defendant Nicholas Mays's Motion to Suppress evidence. ECF No. 55. For the reasons stated below, the undersigned respectfully recommends that the motion be denied.

**BACKGROUND AND PROCEDURAL HISTORY**

On January 29, 2025, a grand jury returned a single count indictment against Nicholas Mays, charging him with possessing one or more machine guns in violation of 18 U.S.C. §922(o). ECF No. 2. Mays was arrested on February 5, 2025, and made his first appearance the same day. He requested, and was granted, time through August 29, 2025, to file or waive pretrial motions. On September 2, 2025, Mays filed a motion to suppress all evidence seized from a 2014 Buick Verano on September 26, 2023, by

members of the Richmond Heights Police Department (RHPD). ECF No. 55.[1] The evidence seized included a Glock 21 handgun, a machine gun conversion device ("MCD"), and ammunition. In the motion, Mays contends the RHPD violated the Fourth Amendment by conducting a warrantless search of his car under the guise of an inventory search that was nothing more than a "ruse for general rummaging in order to discover incriminating evidence." *Id.* at 1-2. The United States has filed responses opposing Mays's arguments. ECF No. 67 & 82.

On February 25, 2026, the parties appeared for an evidentiary hearing on Mays's pending pretrial motions. The United States called Detective Derek Evans from the Richmond Heights Police Department (Det. Evans) and offered into evidence a copy of the Richmond Heights Police Department General Order Number 13 (Govt. Ex. 1), and photographs of items inside the car. Govt. Ex. 2 & 3. Mays did not call any separate witnesses but cross-examined Det. Evans and offered into evidence a vehicle tow record for the Buick Verano (Def. Ex. A), and a tow authorization form (Form 4569) (Def. Ex. B). At the end of the evidentiary hearing the parties requested, and were granted, time to file post hearing briefs. Post hearing briefing was completed on June 26, 2026.

After carefully considering the evidence presented, applicable law, and the parties' written submission, I make the following factual findings and conclusions of law.

## FACTUAL FINDINGS

In September 2023, the Richmond Heights Police Department (RHPD) began an investigation into numerous thefts of credit cards from locker rooms at The Heights, a recreational facility in Richmond Heights (The Heights). ECF No. 76, Evid. Hrng. Tr. at 9, 11 (hereafter "Tr. at ___"). As part

[1] Mays also filed a motion to dismiss the indictment (ECF No. 54) which was addressed in a separate Report and Recommendation issued on August 17, 2026. (ECF No. 83). The undersigned issued separate rulings on Mays's pretrial motions, in part, because the motion to dismiss involved a rapidly evolving area of the law and the undersigned needed additional time to do research and adequately address the motion. There are no additional pending pretrial matters in this case.

of the investigation, detectives obtained surveillance footage of a suspect using stolen credit cards at various stores. Tr. at 10. The surveillance footage also revealed that the suspect was driving a silver Buick sedan when he used a victim's card at one of the stores. *Id.* Using the store surveillance footage and information from the victims' swipe cards at The Heights, the detectives were able to identify Malik Stewart as a potential suspect. *Id*. at 10-11. The detectives asked The Heights staff to notify RHPD the next time that the membership card was swiped for entry. Tr. at 11.

On September 26, 2023, RHPD officers were notified that the Malik Stewart identification card had been swiped. Tr. at 12. Officers, including Det. Evans, responded to The Heights. The officers found the defendant, not Malik Stewart, and detained him. Tr. at 14-16. Because he had used Stewart's card to enter The Heights, May was now a person of interest in the officers' credit card thefts investigation. After they detained Mays, the officers determined he had multiple warrants for other offenses, including state charges for tampering with a motor vehicle and municipal ordinance violations. The officers arrested Mays and transported him to the Richmond Heights Police Department to process him in connection with the arrest warrants and to question him about the credit card thefts. Tr. at 16, 24, 47, 63. When asked if he had driven to The Heights and had a vehicle parked there, Mays stated that he did not. Tr. at 15, 43. Det. Evans testified that he asked Mays about driving because he wanted to know if he was driving the Buick Verano linked to the thefts they had been investigating and also because he was being taken into custody, and his vehicle would need to be towed "so it didn't interfere with the business." Tr. at 16.

At the station, officers searched Mays's belongings and located several credit and debit cards belonging to other individuals. Tr. at 16-17. They also found a membership card to The Heights under the name Malik Stewart, as well as keys to a Buick vehicle. *Id.* When the officers located the car keys, Det. Evans again asked Mays if he had a car parked in the parking lot at The Heights and Mays once

again denied having a vehicle. Tr. at 17. Doubting that Mays was being truthful, Det. Evans contacted another officer and had him look for a Buick sedan in the parking lot of The Heights. Tr. at 19. The officer on scene located a Buick Verano in the parking lot and notified Det. Evans, who then began reviewing surveillance footage from The Heights parking lot. *Id.* The footage showed a person Det. Evans believed to be Mays parking a Buick Verano before his arrest and walking into The Heights with a multicolored backpack with a unique "shark teeth" design on it. Tr. at 19-20; 42. Believing that Mays had driven this vehicle to The Heights prior to his arrest, Det. Evans called for a tow "pursuant to [RHPD] policy with an arrested subject." Tr. at 20.

Det. Evans testified that the Richmond Heights Police Department General Order Number 13 governs the towing of vehicles by police. Tr. at 20-25. Det. Evans explained he called for a tow under Section II.D of the Order, which calls for towing a defendant's vehicle unless one of the situations in the other three subsections exist. Tr. at 21. Det. Evans testified that the other sections of the Order were inapplicable for several reasons. First, he explained that Section II.A. did not apply because "the defendant was not with the car at the time of the tow" so he was not on scene to decide whether to tow or not. Tr. at 21-22. Det. Evans also explained that the second requirement of Section II.A. is that any non-towing disposition of the vehicle may not interfere with a case or infringe on property rights. Tr. at 22-23. Det. Evans testified that had Mays been allowed to leave the Buick Verano at The Heights, it could have infringed upon the property rights of The Heights, as Det. Evans "didn't know how long [Mays] was going to be in custody since he had active warrants." Tr. at 23. Additionally, Det. Evans testified that if Mays were permitted to avoid towing the Buick Verano, it could have interfered with the investigation into the credit card thefts, as the vehicle was "pertinent to the case." Tr. at 23. Det. Evans further testified that Section II.B. did not apply because Mays was in custody on one or more arrest warrants so he was not capable of operating the vehicle at the time of the tow. Tr. at 23-24. Finally, Det.

Evans testified that Section II.C. did not apply because Mays "was not arrested related to a traffic offense" but rather had been taken into custody for questioning and had been arrested on his outstanding warrants. Tr. at 24; *see also* Tr. at 69.

While he was still at the police station, Det. Evans called for a tow truck and had the Buick towed to a local lot. Tr. at 24. Because Det. Evans was still at the police station when he called for the tow, another officer met the tow truck driver at The Heights parking lot and started filling out the tow paperwork, including Form 4569. Tr. at 46, 48, 63-64. Det. Evans explained that "dispatch will have a car go sit with [a vehicle] until the tow truck driver arrives." Tr. at 57. After the vehicle was towed to Terry's Towing, Det. Evans and another detective went to the tow lot to conduct an inventory search of the vehicle. Tr. at 24. Det. Evans testified that he felt "responsible" to complete the inventory search as he was the officer who called for the tow; he also believed that was part of the RHPD tow policy. Tr. at 25.

Det. Evans described how he has conducted inventory searches in his nearly three decades as a police officer. Tr. at 26. He testified that he starts "with the driver's front door and the driver's passenger rear door, around the car, the passenger side rear door, and then the front passenger door, and then the trunk, if [he is] able to open it." Tr. at 26, 27. Det. Evans explained that when conducting an inventory search, he is "just doing an overall visual search of the interior documenting any valuable property inside." Tr. at 27. He indicated that he is not looking "into small nooks and crannies" because the purpose of an inventory search is "[j]ust to document valuables so nothing comes up missing later or they can't come back to the station saying, 'I had a suitcase full of money in there and now it's gone.'" Tr. at 27. Det. Evans testified he conducted the inventory search of the Verano in the same manner as he has been doing throughout his career. Tr. 26. At the tow lot, another detective assisted Det. Evans by taking photographs as Det. Evans searched. Tr. at 26.

Det. Evans testified that once the rear passenger door of the Buick was opened, he saw "a firearm protruding from the top of a "brown satchel that was open." Tr. at 28. Det. Evans noticed that there was a "switch" on the firearm "which makes it basically an automatic weapon." Tr. at 28, 29. Det. Evans testified that the illegal nature of the firearm with the switch was immediately apparent to him. Tr. at 30. Both the firearm and the satchel were seized, and Det. Evans and the other detective searched the satchel further. Tr. at 29, 30. Inside the satchel, there were bags of marijuana, identification papers belonging to Mays and the owner of the vehicle, more credit cards, and close to $800 in U.S. currency. Tr. at 30. The satchel, which had Louis Vuitton markings on it, matched a bag the defendant was seen wearing in surveillance footage making purchases with the stolen credit cards. Tr. at 29 & 36.

Det. Evans filled out the "COMMENTS/INVENTORY" portion of Form 4569, indicating that he had located phone chargers, clothing, and a stroller inside the vehicle. Tr. at 28, 48; Def. Ex. B. Det. Evans testified that the phone charging cables were located within the front cabin of the vehicle, along with some clothing items including a hat, and that more clothing and a child's stroller were located in the trunk. Tr. at 28. He testified that he listed everything "[o]f any value that was not evidence" that was located within the vehicle. Tr. at 49. Det. Evans indicated that between Form 4569, his narrative in the police report, and the photographs taken during the search, "all valuables or belongings and/or contraband" that were located during the search were documented. Tr. at 28-29.

Det. Evans was asked about information he would have included in a search warrant for the Buick Verano, had he pursued one. Tr. at 33-36. Det. Evans stated the following facts were significant to him:

- The suspect in the thefts was observed on video in a Buick sedan (Tr. at 43);
- The defendant appeared to be the same person that was in the store surveillance footage from the investigation (Tr. at 47);
- The defendant had a Buick key fob in his belongings (Tr. at 34);
- The defendant was observed exiting a Buick Verano on surveillance video from The Heights (Tr. at 34);

- The defendant had credit cards belonging to three other people in his backpack (Tr. at 34-35);
- The defendant was seen on surveillance video from The Heights exiting the Buick Verano with the same backpack in his possession (Tr. at 35, 42).

Det. Evans testified that, based on his training and experience, he believed it was possible or likely that the defendant could have other stolen credit cards or merchandise purchased with the stolen credit cards in the Buick Verano. Tr. at 35-36. However, Det. Evans also testified that, at the time he called for the tow truck, he was not thinking about obtaining a search warrant for the car, instead his "thinking was to have the car towed per policy." Tr. at 55.

## CONCLUSIONS OF LAW

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. For a search to be reasonable, the government generally must obtain a warrant supported by probable cause before "physically intruding on constitutionally protected areas" or otherwise searching areas or items in which an individual has a reasonable expectation of privacy. *Florida v. Jardines*, 569 U.S. 1, 8-10 (2013). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014).

Based on the factual findings, there is no question the officers conducted a warrantless search of Mays's car after he was taken into custody on the outstanding warrants. The testimony of Det. Evans establishes that he searched Mays's Buick Verano to inventory any valuables left in the vehicle before leaving it at the tow lot but he also believed, based on information he had learned up until the search, he would find evidence linking Mays and the Buick Verano to RHPD's credit card thefts investigation. The United States contends that because the information Det. Evans had when he searched the Buick amounted to probable cause, the search was constitutionally valid under either the automobile or inventory search exception to the warrant requirement. The undersigned agrees.

### A. Inventory Search

The Supreme Court has recognized inventory searches as an exception to the warrant requirement of the Fourth Amendment. *See Colorado v. Bertine,* 479 U.S. 367, 372 (1987). Under this exception, "a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody." *United States v. Williams,* 777 F.3d 1013, 1016 (8th Cir. 2015). This is because, as the Eighth Circuit has held, when conducting a valid inventory search, police are "engaging in their community caretaking function—not their criminal investigatory function;" as such, "they do not need a warrant or probable cause." *United States v. Taylor,* 636 F.3d 461, 464 (8th Cir. 2011). To be valid, "[t]he search of a vehicle to inventory its contents must . . . be reasonable under the totality of the circumstances and may not be a ruse for a general rummaging in order to discovery incriminating evidence." *Taylor,* 636 F.3d at 464 (internal quotations omitted) (quoting *United States v. Hall,* 497 F.3d 846, 851 (8th Cir. 2007) and *Florida v. Wells,* 495 U.S. 1, 4 (1990)).

In evaluating whether, under the totality of the circumstances, a purported inventory search was a "ruse" used by police to search for incriminating evidence the Eighth Circuit has consistently considered the following two factors: (1) did police adhere to standardized procedures established for conducting an inventory search and (2) even if police failed to adhere to standardized procedures, was there "something else" present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function in searching the vehicle? *See Taylor,* 636 F.3d at 464-65 (reversing district court's denial of defendant's suppression motion where police failed to adhere to standardized procedure requiring a complete inquiry of all contents and the "something else" suggesting inventory search was pretextual was the officer's testimony that the basis for the traffic stop, arrest, tow, and inventory search was the officer's belief defendant had narcotics in his vehicle and but for that belief officer would not

have arrested defendant, impounded his vehicle, or inventoried the contents of his truck); *Hall,* 497 F.3d at 851 (upholding denial of suppression motion on grounds that even if officer failed to abide by standardized procedures, the "something else" was not present because police had legitimate reason to tow when property owner asked police to tow defendant's vehicle from its property); *United States v. Rowland*, 341 F.3d 774, 779-81 (8th Cir. 2003) (holding failure by law enforcement to follow standardized procedures in place coupled with other facts suggested law enforcement "sifted through the vehicle's contents searching only for and recording only incriminating evidence"). The United States bears the burden of showing that its conduct complied with the inventory search exception to the warrant requirement. *Taylor,* 636 F.3d at 464.

***1. The search fell within the inventory search exception***

Based on the factual findings, at the time the RHPD detained Mays, the RHPD had a standardized procedure governing when a vehicle should be towed and how the contents of a towed vehicle should be inventoried. Gov. Ex. 1. The policy required police to tow the vehicle of an arrested person subject to certain exceptions. *Id.* Det. Evans credibly testified that none of those exceptions applied to Mays's situation. *Id.* The RHPD tow policy required officers to, among other things, complete a Missouri DOR Form 4569; conduct an inventory of the interior and trunk areas in order to record all property in the vehicle; refrain from "forcibly" opening locked or sealed items like suitcases and boxes; enter a brief description of the sealed item on the comments/inventory section of the DOR form; and secure the sealed item in the trunk if possible. *See id.*, Section III.C. The tow policy also required that the DOR Form 4569 be completed by the officer requesting the tow; that the officer obtain the signature of the tow operator and provide copies of the completed form to the tow operator and the Records Clerk by the end of the officer's duty. *Id.*

Because none of the exceptions applied to Mays, Det. Evans correctly followed the directives of the tow policy, General Order Number 13, in deciding to tow the vehicle and conduct an inventory search. Based on the evidence, Det. Evans complied with the standardized inventory search procedures set out in the RHPD tow policy with very few discrepancies. The inventory search was lawful because Det. Evans's decision to have Mays's vehicle towed was based upon the RHPD towing policy, and because Det. Evans conducted the inventory search in a manner consistent with that policy. *See United States v. Green*, 929 F.3d 989, 995 (8th Cir. 2019) (holding that decision to impound vehicle was reasonable when "the decision to impound the vehicle complied with the police department's tow policy").

Mays argues that Det. Evans failed to follow certain tow procedures such as the requirement that he personally complete Missouri DOR Form 4569 as the officer requesting the tow, and the requirement that he document all property in the vehicle on Form 4569. This argument is not supported by the evidence. Notwithstanding Mays's suggestions to the contrary, based on the factual findings, although Det. Evans may not have filled out the entire Form 4569, he testified that he completed the "COMMENTS/INVENTORY" section of Form 4569 and identified his handwriting in the area for the description of items in the vehicle. Mays's argument that the tow policy required Det. Evans to document all property in the vehicle on Form 4569 also falls flat when the form is carefully reviewed. As the government points out in its post-hearing brief, the tow policy only requires an officer ordering a tow to complete "an inventory of the interior and trunk areas in order to record all property in the vehicle." Gov. Ex. 1, Section III.C.1. There is no explicit requirement that all property or belongings be recorded on Form 4569, just that they be recorded.

Det. Evans acted in conformity with the tow policy. He listed the phone chargers, clothing, and stroller, which are the items that would be left with the vehicle on the impound lot, on Form 4569. Det.

Evans did not list the items seized as evidence on Form 4569, as those items were seized as evidence and would not be left with the vehicle. Det. Evans indicated that between the DOR Form 4569, his narrative in the police report, and the photographs taken during the search, "all valuables or belongings and/or contraband" that were located during the search were documented as required by the tow policy. The Eighth Circuit has cited, with approval, the approach taken by Det. Evans when, as in this case, a tow policy requires—without specifying how—that police record a vehicle's contents. *See Rowland*, 341 F.3d at 782 (citing with approval the officers' actions in *United States v. Garner*, 181 F.3d 988 (8th Cir. 1999), where "the vehicle's contents were recorded in other ways. Between a towing report, a property record, and photographs the vehicle's contents… were completely recorded").

Mays's reliance on cases such as *United States v. Rowland,* 341 F.3d 774 (8th Cir. 2003) is misplaced because the facts here are easily distinguishable. In *Rowland,* the Eighth Circuit found the police "raised the inventory search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence" because, among other things, "law enforcement called for a drug-sniffing dog to be brought to the scene;" "both [suspects] were detained, even though they were not arrested;" officers "repeatedly asked Rowland whether there was contraband in the vehicle;" and "[officers] . . . testified the search was partly conducted to investigate the possibility Rowland might be trafficking narcotics," *Rowland,* 341 F.3d at 779-80. In this case, Mays was initially detained as a person of interest in the RHPD's theft investigation, and then soon after placed under arrest when officers realized he had outstanding arrest warrants. Although there was most certainly an investigatory aspect to the encounter, the fact that Mays was being taken into custody on an arrest warrant triggered the possibility that, pursuant to the RHPD tow policy, any car he arrived in at The Heights would need to be towed.

The Eighth Circuit has held that the presence of an investigative motive "does not invalidate an otherwise valid inventory search." *United States v. Arrocha*, 713 F.3d 1159, 1164 (8th Cir. 2013) (quoting

*Garner*, 181 F.3d at 991). Even conclusive evidence of an investigatory motive on the part of law enforcement will not taint an inventory search, "as long as their sole purpose is not to investigate a crime." *United States v. Petty*, 367 F.3d 1009, 1013 (8th Cir. 2004).

In sum, the evidence of record in this case makes clear that investigating a crime was not the sole purpose of the inventory search conducted by Det. Evans. As such, the fact that officers conducting the inventory search may have also been on the lookout for incriminating items does not prevent this Court from finding that the search fell within the inventory search exception to the Fourth Amendment warrant requirement. *United States v. Harris,* 795 F.3d 820, 821 (8th Cir. 2015) (holding in conducting inventory searches police may "keep their eyes open for potentially incriminating items they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime").

**B. Automobile Exception**

The "automobile exception" to the warrant requirement "'authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.'" *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). *See also United States v. Shackleford,* 830 F.3d 751, 753 (8th Cir. 2016) ("Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband."). Probable cause to search exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Bieri*, 21 F.3d 811, 815 (8th Cir. 1994) (Probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched."). The Supreme Court has described probable cause as "a practical, nontechnical conception"

that is based on "common sense conclusions about human behavior." *Gates,* 462 U.S. at 231. It is a "fluid concept" that turns on "the assessment of probabilities in particular factual contexts" and is not "readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. In determining whether probable cause exists, courts must analyze the totality of the circumstances surrounding the intrusion. *Id.* at 238.

***1. The officers had probable cause to search the Buick Verano***

Even if the search did not constitute a valid inventory search, there was no Fourth Amendment violation because, based on the factual findings, the officers had probable cause to believe evidence relating to the credit card thefts would be found in the Buick. At the time Det. Evans and the other officer searched the vehicle, they and other RHPD detectives had been actively investigating incidents of credit card thefts at The Heights. The detectives had identified a suspect who had been using the stolen credit cards at various stores in the area; obtained surveillance footage from the stores where the cards were used; and identified a silver Buick sedan that the suspect drove to the stores. Through their investigation, the detectives were able to identify a potential suspect's membership card from The Heights that was used around the same time many of the victims' credit cards were stolen and asked The Heights to notify police the next time that member's card was swiped.

Armed with this information, on September 26, 2023, RHPD officers responded to The Heights when Mays swiped the membership card belonging to the potential suspect. The officers took Mays into custody to question him in connection with the thefts. In that process, they learned Mays had active arrest warrants and placed him under arrest. When the officers searched Mays's property back at the station, they located "stolen credit cards… or cards that did not belong to him", as well as keys to a Buick. Finding the Buick keys raised greater suspicion in Det. Evans because he knew the suspect in the credit card thefts drove a Buick and he knew Mays had denied driving a vehicle to The Heights that day. Det. Evans confronted Mays with the car keys and again asked if he had driven to The Heights, which

Mays again denied. At that point, Det. Evans obtained footage from The Heights confirming that Mays did arrive in the Buick Verano and removed the backpack (that contained potential stolen credit cards) from the vehicle.

Based on the totality of the circumstances known to Det. Evans and the other investigating officers, the officers reasonably believed there was a fair probability that evidence relating to the prior thefts would be found in the Buick. Mays contends the information the officers relied on was either too stale or too lacking in specificity to support a finding of probable cause. The undersigned disagrees. For the reasons detailed above, before they searched the Buick, RHPD detectives had ample evidence that tied the Buick to Mays and the credit card thefts they were investigating. Mays was in possession of the membership card flagged as belonging to a person of interest in the theft investigation; he was also observed on video driving a similar make and model vehicle as the vehicle identified in store surveillance video footage from locations where the stolen credit cards had been used; detectives found keys to a Buick in Mays's belongings after Mays twice denied driving to the Heights on September 26, 2023; detectives also found a credit card belonging to an identified theft victim in the same backpack that Det. Evans saw Mays remove from the Buick before entering The Heights. These facts are more than "sufficient" to justify the "belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched." *Bieri*, 21 F.3d at 815.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Defendant's motion be denied.

In accordance with the Memorandum Opinion above,

**IT IS HEREBY RECOMMENDED** that Defendant Nicholas Mays's Motion to Suppress Evidence (ECF No. 55) be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir. 1990).

Trial in this case will be conducted before the **Honorable Matthew S. Schelp.** Judge Schelp will enter a separate order setting the trial date.

Dated: October 8, 2026.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE